So the first case for argument this morning is Corjasso v. Attorney General of California. Thank you. Good morning. Monica Knox from Mr. Corjasso. I'm going to reserve two minutes for rebuttal and I'll watch my own time. This Court has said that the whole point of VOID-R is to elicit information from the veneer that may shed light on bias, prejudice, interests in the outcome, competence and the like, so that counsel and the parties may exercise their judgment about whom to cede and who to challenge. That's exactly what didn't happen here as to Juror Hill because defense counsel asked no questions. There is some evidence in the record that they thought that an older woman would be the jury. What do we do with that evidence? Yes, it is true that Mr. Ward said that he believed women were more judgmental than men and therefore he wanted women and then he said particularly older women. Now of course had he challenged Ms. Hill and she had been excused, there would have been another woman that followed her into the box and Mr. Ward knew that. But that's not really the issue. The issue is that he was in no position to make a determination. He wanted older women and that's fine, regardless of whether we agree with his reason or not, that's fine and it's a legitimate strategy. But he can't want older biased women in lieu of a younger unbiased woman, right? And that's the problem. Let's talk, then, about bias. She was the client of another lawyer in the United States and a firm. Yes. Do we have to have more than that to show bias or is that enough? Well, as a practical matter, he wouldn't have needed more than that because as the trial judge pointed out to him when the issue came up, that I can excuse her for that reason. But at this point, given that that didn't happen and he didn't challenge her, yes, there would have to be more to show that she's actually biased or even that she's implicitly biased. But the problem here is that he didn't ask the questions to find out. If we compare what he knew to what he didn't know, it's really, really significant. All he knew about her is that she didn't answer the question when the jury was specifically asked, are any of you familiar with anyone in his law firm? She didn't raise her hand to say yes. And what's interesting about that is Judge Hill knew the concept. She may not have understood the concept of if you're a client of one lawyer, you're a client of the whole firm. But she certainly understood that Mr. Rasmussen, the prosecutor, was in the same firm as Mr. Ralston, the lawyer who was representing her. She knew that because what she said is when she finally got to answer the question, got around to answering it after not answering it, what she said is, no, you weren't my lawyer, your partner was. So she knew that. And yet when she was first asked the question, is anybody familiar with this firm, has anyone ever been represented by this firm, she didn't respond. That's one of the things that Mr. Ward knew. He also knew that when she was singled out by name because nobody responded and Mr. Rasmussen had already said it's Grace Hill who was a client, she was specifically asked, Grace Hill, the prosecutor, Mr. Rasmussen said I believe it was Grace Hill who was a client. And the first things out of Ms. Hill's mouth is that's not me. Well, it was her. Now, I don't know what that means. I don't necessarily think it means she was lying, but they were the first words out of her mouth and they weren't accurate. So he knew that was the second thing he knew. The third thing he knew is that she called the firm during trial. And the fourth thing he knew is when yet again asked about calling the prosecutor's firm when that came up, the first word out of her mouth was no, I didn't. Now, it is true she didn't call Mr. Rasmussen, she called Mr. Ralston, but the question was did you call the firm. She then said something different, but all of that was suspicious enough. Then look at what he didn't know because he didn't ask. He didn't know the full extent of the relationship. And what's important about that is they were all minimal actions. I concede that. That there was nothing, this was not he hadn't represented her at a four-month murder trial or something. These were minimal things. Two small claims actions, which the firm had been successful in winning for her, and two other advice issues on burial plots and on school records, okay? But the point is that this woman, every time she needed advice, called this firm. And so it shows that she has some trust in this firm. And one of the things that's important about that, even though she wasn't dealing directly with Mr. Rasmussen, is Mr. Rasmussen was very high profile in this small community. He had been a judge for many years in this small community. And in general, the public imputes a fair amount of integrity to judges. And so the issue is what we don't know, what Ms. Sill thought, is if Mr. Rasmussen and his position in the community was part of the reason she kept calling this law firm. Let me ask you a question, madam. My worry about this is a little bit different. Seems to me you're arguing for the losing side on a discretionary situation. And you're citing all the facts that you can possibly put together. But what we really have here is we have a habeas review. We have a habeas review with a state court judge having done an evidentiary hearing. And the state court judge says, after everything was said and done, and I listened to all the evidence, I believe the attorney. The state court judge didn't say that, Your Honor. We have a district court judge. The state court did not give him an evidentiary hearing. Okay. I understand that. But after going all the way through this, all the step of the way, all the way through the habeas proceeding to the top court, nobody says there's a problem. Nobody says that this is a situation which ought to be changed. And then we have the district court judge coming in and having his hearing and saying, I believe the attorney. Now, I am called upon on that kind of a, if you will, deferential standard to say that they're all wrong. Okay. Why? Are they all wrong? Because we've got, number one, I was a trial attorney once in a while. I had a few jurors that were on the jury. I knew the kind of a juror I wanted. And if I had in front of me the questionnaire, I knew what the juror had said in the questionnaire. I knew the type of things that were happening. And all the things said and done, I would still want that juror rather than next one if I thought they were going to be somebody against me. With all due respect, I don't believe it is effective assistance of counsel to want a potentially biased juror without inquiring into bias. Well, the inquiry into bias may lead you to lose the very juror you want. I mean, there are situations when, as a trial defense attorney, if I'm wanting somebody who I believe will help my defendants out, I don't want to inquire too much into their potentials, or there could be a possibility that the other side could have a chance to throw away what I would want. Well, but depending on what the situation is, that could be a reasonable tactic. But you can't, no defense attorney can forego inquiring into potential bias. Well, but here's the problem that I see. And I appreciate what you're arguing. But the problem that I see after a district judge has had the opportunity to inquire, to look at the evidence, to make the determination that they make, and still come down and say there was no problem here, now me on appeal based on simply because there's some idea that one ought to have, and I'm not arguing that. Then I've got to undo the verdict, or undo what happened. Well, Your Honor, the district court's finding that there was not ineffective assistance to counsel is subject to de novo review here. It's not subject to deferential review. And that isn't true as to the facts they find. Well, that's – but whether it was ineffective assistance to counsel is not a fact. That's a legal question. He found a fact that he believed the attorney that was in front of him. And I'm not challenging anything that the attorney said. The attorney conceded he didn't ask all those questions. He conceded that he didn't know those things. Do you want to stay for a minute? Yes, I do. Thank you. You might want to think about addressing prejudice, because that's where in the mind it rests. I will. Thank you. And may it please the Court, Ward Campbell for the appellee. This case was remanded for an evidentiary hearing as to whether or not Mr. Ward provided effective assistance to counsel in regard to Juror Hill. An evidentiary hearing was held in the district court, and we have an order, findings and recommendations, and an order, which meticulously analyzed both the record and the demeanor of the witnesses in reaching a conclusion that, in fact, Mr. Ward did act reasonably in the way he handled the matter regarding Juror Hill. And there has been – although there have been a lot of attacks on those findings as regarding how the district court or the magistrate resolved those matters, they certainly have not shown clear error in those findings. The fact is, Mr. Ward was very concerned about who the next juror was going to be in that case, and it wasn't enough that she was just another woman. She was a younger woman who didn't fit the profile of the type of juror that he was looking for in this case, and he recalled that it was also a woman or a potential juror who had other issues about attitude that also bothered him. And he did not want that next juror. So it isn't merely a fact of one woman replacing another. In fact, it was, in fact, the possibility of replacing Juror Hill with an alternate who was far less acceptable to Mr. Ward for purposes of trying this case. Tell me a little bit more about the juror that wasn't put on. This is the alternate, Ms. Genesee. And all we have to go on that is Mr. Ward's recollection at the evidentiary hearing. We know she was younger. I believe she was 37 or 38 years old. I'm not going to give the relative about older or younger, but she was definitely younger than Ms. Hill. And also that he recalled a particular matter regarding her attitude or a certain amount of rigidity, something about her attitude or demeanor that also bothered him as a potential juror in this case. It wasn't just the age and the gender. It was also, in fact, something else about her in particular that he was concerned with. And he testified about that at the evidentiary hearing. On the other hand, the issues about Ms. Hill and her responses to these matters about her relationship with Mr. Rasmussen's firm, it's an unusual case where this is a Sierra County case. Apparently they got transferred to Eldorado County. It's a small county. They obviously hired a special prosecutor in the Tahoe area to handle this case, and that was Mr. Rasmussen. So it's a law firm situation. And the matter of both times when this issue came up during the trial, it's clear, and I think this is what the magistrate found, I think it's clear from the record, that there's a certain amount of confusion on the part of Juror Hill about the difference between being represented by a particular attorney and being represented by the attorney's firm. At both times when it was brought out to her specifically, she certainly was candid about the fact that she was talking to Attorney Ralston, not Attorney Rasmussen, about very minor matters, far from substantial matters, as this Court said in its earlier opinion. And furthermore, Mr. Rasmussen didn't even know Juror Hill. And in fact, it's obvious that Attorney Ralston barely remembered who Juror Hill was because he wrote on the little note that was circulated around the law firm that she may be a former client. So this was not a significant client with the firm. Her inquiries were very insignificant and her contacts were very insignificant. And she was, in fact, up front about it when she was squarely explained to her the difference about talking to Mr. Ralston as opposed to talking to the firm. And I think both times it's in the matter where it reflects that confusion about the situation. I guess we don't care what the lawyers thought. If she thought she was a significant client, that would be the critical thing. Well, obviously we don't know what she thought. I think that it is important that the attorney, I think, who was present there and had a chance to witness her and observe her, obviously did not draw any adverse conclusions about her based on what he observed at the time going on in those proceedings regarding Juror Hill. I think that the ---- Am I correct that, well, she gets asked questions twice during this trial, once during the voir dire, and then later when it turns out she calls the partner during trial. Right. But during the first part, during voir dire, when she's asked, after she says she's not a client of prosecutors, she says I'm not your client, but she admits she was a client of the associate. So the record is not ambiguous on that, is it? Well, what I mean by that is to the extent that there's an argument about whether or not she was being untruthful or something like that, what I mean to say is I think her whole response, you know, I'm not her, is, you know, Mr. Ralston's my attorney, not you. It's obvious. Well, she says it's an associate. Yeah, it's an associate. So she ---- what I'm trying to understand is both the briefs seem to talk about some ambiguity and whether there was a misrepresentation. It seems to me that was accurate representation. And I agree with you, Your Honor. I think there's something odd about the phrase I'm not her, I think, that is what everybody has kind of focused on without looking at the rest of the comment in which she clarifies. I don't mean to ---- you're not my attorney. Mr. Ralston is. Counsel, the biggest situation that I find for you is we're really under a Strickland review here, and we have an attorney who had the facts in front of him that both you and counsel seem to suggest that he had, and he asked no question. Well, isn't that a substandard performance? Your Honor, I think, once again, it boils down to in the circumstances of this case, number one, in fact, once it was brought out and clarified what her contacts were, and she was, in fact, asked specifically by Mr. Rasmussen if she could be fair and impartial, and she said yes. And she was candid about her situation. There was no indication at all that she was trying to hide anything or had any desire to be untruthful or less than candid with the court. She fit the profile for the type of juror that Mr. Ward wanted. There was, in fact, in these circumstances, it was not unreasonable for him to simply leave this matter the way it was. He was content with this matter the way it was. There was nothing more to add to the record. It seems to me to pile on, though. I mean, she says, okay, well, I'm not her, but I actually dealt with one of your associates. And then he says, well, can you be fair, of course. Isn't that precisely when Mr. Ward should have said, whoa? I mean, of course she's to the extent she might be biased or feel some affinity to those gentlemen, of course she wasn't going to say I can't be fair to you. Isn't that precisely when Mr. Ward should have jumped in to see what she really had done or what she really was thinking? Well, Mr. Ward is present. He's observed the circumstances. He's observed her in the exchanges. She fits the profile of the type of juror he wants. He has an alternate he does not want. At that point, there's none other reason for him to simply reach the conclusion that this is a juror who is not going to be affected by the fact that she's had minimal contacts with another attorney in a law firm that she doesn't even really know the trial attorney in this firm. The situation on the peremptory is at that point. I mean, he doesn't have to bounce her. He can get more information and still decide that he's not going to disqualify her. Your Honor, there are probably several different ways any types of these types of matters can be handled. There probably is no one perfect way, but they're not required to absolutely do it in one particular way. It depends on the facts and circumstances of the case. That's, of course, the underlying premise of Strickland about the multiple choice. Well, yeah, but he doesn't want that other juror. Well, how do we know that unless he knows more about her? In other words, he may in the end decide, well, you know, she's no perfect juror either, but on balance, even with me knowing more and finding out more, I'm sticking with her and foregoing the younger juror. But I think the question in terms of ineffective assistance of counsel is, well, doesn't he have some obligation to put the constellation of facts on the table so that he can make an informed judgment? Well, Your Honor, once again, and I think we've stated our position on this, that in this situation, given the nature of what had already been revealed about her contacts and her understanding of the situation between knowing Mr. Rasmussen and making calls or having contacts with one of the partners in his firm, and what he already knows about the juror he's going to have coming up, it was not unreasonable for him to be satisfied with her responses as they were in the explanations that he received. And I think the important thing, obviously, since we are talking about Strickland, is that regardless of that, given what we do know, I think, about her contacts, what we know already now in the record about the fact that they did not want the alternate juror who was going to come into play, that you can't say that the decision not to. I'm sorry, go ahead, Your Honor. Counsel, if she had been excused, it would have been probably for cause, and he could go on down. I don't know how many challenges he had, but I don't think he was necessarily stuck with the next one in line. Possibly after the trial started and there was this further colloquy, he might have been stuck with the alternate. But before the jury was impaneled, there were a lot of options still open. Well, it appears to me they did 30 juries. It looks to me like they were doing a struck system where apparently they probably knew exactly which jurors were going to come up next as it went along. And that would very well affect the way you would handle the jury selection. That's the way I understood it. Let me ask you the second question. If we find this was substandard performance, is there prejudice? No, because there's been no showing that excusing this juror would have and replacing it with another juror that is reasonably probable the outcome would be different. You're not undermining confidence in the outcome because you've had no showing that this juror, in fact, was genuinely biased or would be no more than replaced by an equally unbiased juror. But it's a structural error to have a biased decision-maker. So I'm not sure you even move to prejudice if, in fact, bias were established. Well, this claim is in the context of an ineffective assistance of counsel, apparently for not investigating a juror, and you simply don't have the facts in front of you to establish that you've got a biased juror. You may believe that there was deficiency in terms of how Mr. Ward pursued this matter, but that does not take you to the second step of automatically concluding that this juror was, in fact, biased. And so you simply can't reach that level of structural error. You would still need to show it's reasonably probable that the outcome would be different. And I'm looking at the clock. Unless there are any questions, I would submit it. I think there's no further questions. Thank you. I'll get right to prejudice. The first thing is that Mr. Ward testified, defense counsel testified, that he would have let his client make the determination. And so we know, because the district court said he did not find Mr. Corgioso not credible. He just said I think he's inaccurate as to the parts that Mr. Ward says something else about, right? Mr. Corgioso says, and it's undisputed, that had he known what he knows now about Juror Hill, he would have said I don't want her. And Mr. Ward said if he had said I don't want her, she wouldn't have sat. I would have excused her no matter what I thought about who was getting in the box. The other thing about who's getting in the box and women and their attitudes and all that is you have to understand at the time this issue came up, ten of the 12 jurors were women. He was going to end up with an awful lot of women, whether or not Ms. Hill sat, and even whether she was replaced by a man or a woman with a younger woman with an attitude. There were going to be a lot of women on this panel. There are other things about Juror Hill that make her a problematic juror anyway. She did not have an inclination to be aware of her biases and not let them play a role in this. She sent a note to the judge during deliberations asking who was paying for Mr. Corgioso's attorney. Was he paying or was the county paying? Now, that's a problematic answer. The judge answered it by saying it's none of your business, which was good, but what that answer did was to put the juror in check as to any potential bias she may have. That would have been one of the reasons that Mr. Ward should have asked the questions, because even if it deterred the kind of bias we're talking about is this idea that these are people, this firm is a firm of integrity. If they say something, I can believe it. I can rely on it. It may be something she's not even aware of. The very questioning of her would have made her aware of it and could have put it in check. And to the extent, my final comment is, to the extent that we can't be absolutely sure whether she was biased or not, that is because of the nature of the ineffectiveness. The only reason we don't know whether she was biased or not is because Mr. Ward didn't ask the questions. And by the time he was final on appeal, Ms. Hill was already dead, and so nobody could ask the questions. Thank you. Thank both counsel for your argument this morning. The case of Corgiasso v. The State of California is submitted.
judges: Fletcher, McKeown, Smith